NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|   |   |
|---|---|
| KEVIN MCMANUS, | : |
| Plaintiff, | : Civil Action No. 15-2109 (BRM)(LHG) |
| v. | : |
|   | : OPINION |
| BARNEGAT REHABILITATION AND NURSING CENTER and CROWN EQUIPMENT CORPORATION, | : |
| Defendants. | : |

**MARTINOTTI, DISTRICT JUDGE**

Before this Court are (1) Defendant Crown Equipment Corporation's ("Crown") Motion for Summary Judgment (ECF No. 65) and (2) Defendant Barnegat Operating Company, L.P. d/b/a Barnegat Nursing and Rehabilitation Center's ("Barnegat") Motion for Summary Judgment (ECF No. 66). Plaintiff Kevin McManus ("McManus") opposes both motions. (ECF Nos. 73 & 69.) Pursuant to Federal Rule of Civil Procedure 78(b), the Court did not hear oral argument. For the reasons set forth below, Crown's Motion for Summary Judgment is **GRANTED**, and Barnegat's Motion for Summary Judgment is **DENIED**.

**I.   BACKGROUND**

This personal injury lawsuit "arises out of a one-person accident [(the "Accident")] that occurred on August 3, 2012, while [McManus] was unloading a pallet of materials with a manual pallet truck at [Barnegat]." (Crown's Statement of Undisputed Material Facts in Supp. of its Mot. for Summ. J. (ECF No. 65-2) ¶ 2); Pl.'s Resp. to Crown's Statement of Material Facts (ECF No. 74) ¶ 2.) McManus alleges Barnegat failed to provide a safe means to make deliveries to its

1

building and claims the pallet truck (the "Pallet Truck"), which Crown manufactured, malfunctioned during the Accident. (Barnegat's Statement of Undisputed Material Facts in Supp. of its Mot. for Summ. J. (ECF No. 66) ¶¶ 1-2); Pl.'s Resp. to Barnegat's Statement of Material Facts (ECF No. 70) ¶¶ 1-2.) On July 25, 2014, McManus filed a six-count Complaint (ECF No. 1-1) in the Superior Court of New Jersey, Ocean County, Law Division, under Docket Number OCN-L2120-14, asserting a claim for negligence against Barnegat (Count I), and a claim for negligence and/or strict liability against Crown (Count III).[1] On March 24, 2015, Crown removed the case to this Court. (ECF No. 1.)

### A. The Pallet Truck

McKesson Medical purchased the Pallet Truck, which was delivered fully assembled. (ECF No. 74-1 ¶ 29; ECF No. 75-1 ¶ 29.) The Pallet Truck was from the Crown PTH 50 series ("PTH 50"). (ECF No. 65-2 ¶ 6; ECF No. 74 ¶ 6.) McManus and Crown dispute the age of the Pallet Truck. (McManus's Additional Statement of Undisputed Material Facts in Opp'n to Crown's Mot. for Summ. J. (ECF No. 74-1) ¶ 5; Crown's Resp. to Pl.'s Additional Statement of Material Facts (ECF No. 75-1) ¶ 5.) McManus claims the Pallet Truck "was a brand new pallet jack and had been purchased from Crown by McKesson [Medical] within three (3) months prior to" the Accident. (ECF No. 74-1 ¶ 5.) Crown disputes this and contends McManus never identified the serial number for the Pallet Truck, which prevented Crown from producing a sales invoice for the item. (ECF

---

[1] McManus also asserted: (1) a negligence claim against Heartland Rehabilitation Services, which he alleged is the parent company of Barnegat (Count II); (2) a claim for negligence and/or strict liability against John Doe defendants, which he alleges are Crown's parents and/or successors in interest (Count IV); (3) a claim for negligence and/or strict liability alleged jointly and severally against all defendants; and (4) a claim for discovery against his employer, McKesson Medical, for discovery. (ECF No. 1-1.) Heartland Rehabilitation Services was terminated pursuant to the Notice of Removal. (ECF No. 1-4.) After the Court denied McManus' Motion to Amend the Complaint to assert a fraudulent concealment/spoliation claim against McKesson Medical (ECF No. 62) the parties agreed McKesson Medical should be dismissed from the case. (ECF No. 78.)

No. 75-1 ¶ 5.)

The PTH 50 "is controlled using a spring-loaded metal handle that can be positioned from vertical to almost horizontal. (ECF No. 65-2 ¶ 7; ECF No. 74 ¶ 7.) The PTH 50's handle features an actuating lever. (ECF No. 65-2 ¶ 8; ECF No. 74 ¶ 8.) To raise pallets, a user adjusts the PTH 50's actuating lever to the "raise" position and then pumps the handle to cause the forks to lift the pallet via hydraulics. (ECF No. 65-2 ¶ 8; ECF No. 74 ¶ 8.) To move the PTH 50, a user adjusts the actuating lever to the "neutral" position. (ECF No. 65-2 ¶ 9; ECF No. 74 ¶ 9.) Finally, a user adjusts the actuating lever to the "lower" position to lower the forks. (ECF No. 65-2 ¶ 10; ECF No. 74 ¶ 10.) The farther the actuating lever is pulled up toward the handle, the faster the forks will lower. (ECF No. 65-2 ¶ 11; ECF No. 74 ¶ 11.) The PTH 50 is designed so the handle's position—whether upright perpendicular to the ground, or lowered—does not affect the mechanics of lowering the forks. (ECF No. 65-2 ¶ 12; ECF No. 74 ¶ 12.)

### B. Deliveries to Barnegat and The Accident

At the time of the Accident, McManus working for McKesson Medical as a lead driver/dispatcher, which required him to make deliveries once or twice a week. (ECF No. 65-2 ¶¶ 3, 5; ECF No. 74 ¶¶ 3, 5.) Prior to the Accident, McManus had been to Barnegat twice before with his colleague, Edward Thurston, who routinely made deliveries to Barnegat. (ECF No. 66 ¶ 7; ECF No. 70 ¶ 7.) McKesson Medical employees had made deliveries to Barnegat every Friday since McManus became a lead driver for the company in the summer of 2012. (ECF No. 66 ¶¶ 3, 11; ECF No. 70 ¶¶ 3, 11.) McManus claims Barnegat required drivers to make deliveries to the rear of the facility, which sloped downward toward the door. (ECF No. 65-2 ¶ 17; ECF No. 74 ¶ 17; ECF No. 66 ¶ 12; ECF No. 70 ¶¶ 12.) McKesson Medical drivers had complained about making deliveries to Barnegat, because on two occasions the truck was unloaded while on a slope and this caused pallets to roll out of control. (ECF No. 66 ¶ 13; ECF No. 70 ¶ 13.) Because of this slope,

McManus believed it was safer for two people to deliver pallets to Barnegat. (ECF No. 65-2 ¶ 20; ECF No. 74 ¶ 20.) One of the workers would steer the pallet by holding the handle of the pallet truck, while the other would hold the loaded pallet to slow it down. (ECF No. 74-1 ¶ 44; ECF No. 75-1 ¶ 44.) If the pallet load gained momentum, the pallet truck operator would lower the forks of the pallet truck to drop the load and stop the momentum of the pallet truck. (ECF No. 74-1 ¶ 45; ECF No. 75-1 ¶ 45.) However, on the date of the Accident, McManus made the delivery to Barnegat by himself. (ECF No. 65-2 ¶ 22; ECF No. 74 ¶ 22; ECF No. 66 ¶ 15; ECF No. 70 ¶ 15.)

McManus received training on using the PTH 50 from McKesson Medical and received training at least once a year on the general use of manual pallet trucks. (ECF No. 65-2 ¶ 13; ECF No. 74 ¶ 13.) However, he did not receive any training on how to operate a pallet truck on a slope. (ECF No. 74-1 ¶ 47; ECF No. 75-1 ¶ 47.) On the day of the Accident, McManus performed routine inspections of the Pallet Truck. (ECF No. 74-1 ¶¶ 5-6; ECF No. 75-1 ¶¶ 5-6.) McManus made several deliveries before the delivery to Barnegat and used the Pallet Truck at each of them. (ECF No. 74-1 ¶ 35; ECF No. 75-1 ¶ 35.)

When he was making the delivery at Barnegat, McManus slid the Pallet Truck's forks under the pallet and began to back the pallet away from the interior wall of the truck in an "S" like, or zigzag, manner "so the full weight of the pallet was not on him." (ECF No. 74-1 ¶ 53; ECF No. 75-1 ¶ 53.) McManus made it halfway through the truck when the Pallet Truck suddenly picked up momentum. (ECF No. 74-1 ¶¶ 61-62; ECF No. 75-1 ¶¶ 62-62.) To slow the Pallet Truck down, McManus testified he hit the release lever, but the pallet did not drop. (ECF No. 74-1 ¶ 63.) Crown denies the Pallet Truck malfunctioned. (ECF No. 75-1 ¶ 63.) McManus testified his arm became tangled in the handle of the Pallet Truck, which dragged him to the back of the truck. (ECF No. 74-1 ¶ 65.) Despite this episode, McManus was able to complete the delivery to Barnegat, after

4

which he radioed his supervisor at McKesson Medical, Eric Lambert ("Lambert"), and informed him he had had an accident at Barnegat. (ECF No. 74-1 ¶¶ 68, 70; ECF No. 75-1 ¶¶ 68, 70.)

### C. McKesson Medical's Post-Accident Inspection of the Pallet Truck

McManus testified several McKesson Medical employees observed an inspection of the Pallet Truck after the Accident in which the Pallet Truck did not function properly. (ECF No. 74-1 ¶¶ 72-74.) Specifically, the Pallet Truck's forks did not drop properly unless the device's handle was positioned upright at a 90-degree angle. (*Id.* ¶ 74.) When the Pallet Truck's handle was positioned completely upright, the forks dropped immediately, but if the handle was in any other position the forks dropped slowly. (*Id.* ¶¶ 75-76.) Lambert testified he tested the Pallet Truck after the Accident and found the forks did not drop unless the handle was completely upright. (*Id.* ¶ 78.) The Pallet Truck was stored at McKesson Medical's warehouse after the accident, but the Pallet Truck disappeared months later when the warehouse was demolished. (*Id.* ¶¶ 87-91.)

## II. LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. *Anderson*, 477 U.S. at 248. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in

5

his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the moving party will bear the burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *Id.* at 331. On the other hand, if the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment may satisfy Rule 56's burden of production by either (1) "submit[ting] affirmative evidence that negates an essential element of the nonmoving party's claim" or (2) demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Id.* Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324; *see also Matsushita*, 475 U.S. at 586; *Ridgewood Bd. of Ed. v. Stokley*, 172 F.3d 238, 252 (3d Cir. 1999). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "[A] complete

failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

### III. DECISION

#### A. Crown's Motion for Summary Judgment

Crown argues it is entitled to summary judgment because: (1) the report of McManus's product liability expert, Thomas J. Cocchiola, P.E., C.S.P. ("Mr. Cocchiola"), is inadmissible; (2) McManus has failed to proffer a *prima facie* products liability claim; and (3) even if Mr. Cocchiola's report were admissible, McManus has offered no proof of a manufacturing defect. (Crown's Br. in Supp. of its Mot. for Summ. J. (ECF No. 65-6) at 1-2.) The Court considers these arguments in turn.

##### 1. The Admissibility of Mr. Cocchiola's Expert Report

Federal Rule of Evidence 702 governs the admissibility of expert testimony. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993). The Third Circuit has held "Rule 702 embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 80 (3d Cir. 2017) (quoting *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994))).

> First, the witness must be qualified to testify as an expert. Qualification requires that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that a broad range of knowledge, skills, and training qualify an expert as such. Second, the testimony must be reliable. In other words, the expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief. An assessment of the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity. Third, the expert testimony must fit, meaning the expert's testimony must be relevant for the

purposes of the case and must assist the trier of fact.

*Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (quotations and citations omitted). Crown argues Mr. Cocchiola's testimony is inadmissible based on all three criteria. (ECF No. 65-6 at 7-8.)

### a. Mr. Cocchiola's Qualifications

The Third Circuit has held the standard for an expert's qualifications is a liberal one. *Calhoun*, 350 F.3d at 321; *see also Elcock*, 233 F.3d at 742. "For a court to qualify a witness to testify as an expert, Rule 702 requires the witness to have 'specialized knowledge' regarding the areas of testimony." *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998). The expert can base his or her specialized knowledge on practical experience or formal training. *Id.* (citations omitted). The Third Circuit has stated the qualification standard is liberal, though "at a minimum, a proffered expert witness . . . must possess skill or knowledge greater than the average layman." *Id.* (quoting *Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110, 114 (3d Cir. 1987)).

Crown argues Mr. Cocchiola does not satisfy the "qualifications" criterion because "he has no relevant prior training or experience in pallet truck manufacture or design that could qualify him to testify in this matter." (*Id.* at 9.) Crown also contends Mr. Cocchiola "has never been involved in the manufacturing, designing, or proposing warnings for any material handling equipment on the market today." (*Id.* at 10.) Crown relies on *Calhoun*, in which the Third Circuit affirmed the district court's exclusion of a marine safety expert and a naval architecture/marine engineering expert called to testify regarding the adequacy of a jet ski's warning. (*Id.* at 10 (citing 350 F.3d at 318-19, 323).) The Third Circuit held, although an expert's "background, education, and training may provide an expert with general knowledge to testify about general matters, more specific knowledge is required to support more specific opinions." *Calhoun*, 350 F.3d at 322. Crown argues Mr. Cocchiola should be similarly excluded because, while he is an engineer, he has

8

no specific knowledge related to the design and manufacture of a product like the Pallet Truck. (ECF No. 65-6 at 10.)

McManus argues Mr. Cocchiola satisfies the qualifications criterion. (Pl.'s Br. in Opp. to Crown's Mot. for Summ. J. (ECF No. 73) at 15.) McManus cites Mr. Cocchiola's twenty-seven years as an engineering consultant, including testifying as an engineering expert in twenty-one other cases. (*Id.* at 16.) McManus points out Mr. Cocchiola's service as an expert consultant in a case involving a "walkie rider pallet truck," which McManus argues is a product similar to the Pallet Truck in this case. (*Id.* (citing Cocchiola Dep.[2] at 26:3-18).) Finally, McManus cites Mr. Cocchiola's affiliation with the American Society of Mechanical Engineers, the National Society of Professional Engineers, the National Academy of Forensic Engineers, and the American Society of Safety Engineers. (*Id.* at 16.)

The Court finds Mr. Cocchiola is satisfies the qualifications criterion. Mr. Cocchiola has nearly three decades of engineering experience and has testified as an engineering expert in numerous other cases. Significantly, he served as an expert consultant in a case involving a rider pallet truck. Crown's contention that Mr. Cocchiola is not qualified because he has not been involved with the design or manufacture of a product like the PTH 50 overstates the standard the Third Circuit has applied. Mr. Cocchiola's qualifications relate to mechanical engineering, which is the subject about which he testifies. This is distinguishable from the disqualification of the marine safety expert and a naval architecture/marine engineering expert called to testify about safety warnings in *Calhoun*. 350 F.3d at 323; *see also Aloe Coal*, 816 F.2d at 110 (finding the district court abused its discretion in allowing a tractor sales representative with no engineering or

---

[2] Both McManus (ECF No. 73-9) and Crown (ECF No. 65-5) cite portions of Mr. Cocchiola's deposition. The Court cites from both parties' portions herein but for uniformity refers only to the transcript's page and line numbers.

mechanical experience to testify as to the cause of a tractor fire).

### b. Mr. Cocchiola's Reliability

"In order for expert testimony to meet *Daubert*'s reliability standard, it must be based on the methods and procedures of science, not on subjective belief and unsupported speculation." *Karlo*, 849 F.3d at 80-81 (quoting *In re TMI Litig.*, 193 F.3d 613, 703-04 (3d Cir. 1999)). In order to be admissible, the expert's opinion does not need "the best foundation," or to be "supported by the best methodology or unassailable research." *Id.* at 81 (quoting *TMI*, 193 F.3d at 665). Instead, the expert's testimony must be supported by "good grounds." *Id.* (citing *TMI*, 193 F.3d at 665). The Third Circuit has held "[t]he standard for reliability is 'not that high.'" *Id.* (quoting *TMI*, 193 F.3d at 665). Among the factors the Third Circuit has stated courts should consider to assess an expert's reliability are:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Elcock*, 233 F.3d at 745-46 (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 742 n.8 (citing *Daubert*, 509 U.S. 579; *United States v. Downing*, 753 F.2d 1224, 1238-41 (3d Cir. 1985))).

Crown argues Mr. Cocchiola does not satisfy the reliability criterion because he has not inspected the Pallet Truck or tested any of his opinions. (ECF No. 65-6 at 10.) Crown argues McManus's testimony provided Mr. Cocchiola's only basis for the conclusion that the Pallet Truck's forks lowered too slowly. (ECF No. 65-6 at 12.) Crown further contends, "Mr. Cocchiola did not perform any testing of the exemplar pallet truck he inspected." (*Id.* at 13.) Crown points out Mr. Cocchiola identified variables other than manufacturing defect, such as the load weight,

the speed the Pallet Truck was moving, and the angle of the slope, that could have contributed to the Accident. (*Id.* (citing Cocchiola Dep. at 74:23-75:1; 80:12-25).) Crown notes Mr. Cocchiola testified he did not attempt to recreate the Accident in any way. (*Id.* at 13-14 (citing Cocchiola Dep. at 68:11-70:8).) Finally, Crown argues Mr. Cocchiola identified alternative explanations for the Accident but failed to negate these explanations. (*Id.* at 15-16.) Crown cites Mr. Cocchiola's report, which states factors such as "wear and tear," "inadequate maintenance," or "a build-up of debris" could contribute to the slow lowering of the Pallet Truck's forks. (*Id.* at 15 (citing Cocchiola Engineering Report (ECF No. 65-6) at 10-11).)

McManus argues Mr. Cocchiola satisfies the reliability criterion. (ECF No. 73 at 17.) He points out the Pallet Truck was lost, which prevented Mr. Cocchiola from testing the product. (*Id.* at 18.) McManus contends Mr. Cocchiola's inspection of the exemplar was sufficient, as "[a] test of the internal variables of the exemplar pallet jack . . . would not have aided the trier of fact in determining whether there was a ***manufacturing*** defect in with the discarded defective jack." (*Id.* at 20.) Rather, McManus argues, Mr. Cocchiola's inspection of the exemplar confirmed how the PTH 50 is intended to function. (*Id.*) Finally, McManus points out Mr. Cocchiola based his conclusion not solely on McManus's testimony, but on the testimony of three other McKesson Medical employees who described similar problems with the Pallet Truck. (*Id.* at 19 (citing Dep. of Timothy Collins (ECF No. 73-5) at 53:22-54:2; Dep. of Marcus Steward (ECF No. 73-6) at 71:3-11; and Lambert Dep. (ECF No. 73-3) at 94:8-15).)

The Court finds Mr. Cocchiola satisfies the reliability criterion. Mr. Cocchiola's inspection of the exemplar allowed him to determine the proper function of the PTH 50. (ECF No. 65-5 at 3-4.); *see Mendez v. Shah*, 28 F. Supp. 3d 282, 298 (D.N.J. 2014) (finding a product alleged to have a manufacturing defect may be measured against the same product manufactured according to the

11

manufacturer's standards). Mr. Cocchiola considered other factors that could have interfered with the Pallet Truck's ball check valve movements, such as debris buildup. (*Id.* at 11.) Mr. Cocchiola ruled out faulty maintenance as the cause of the Accident. (*Id.* at 13.) Mr. Cocchiola acknowledged the Pallet Truck "would have to be disassembled to identify the specific condition(s) that prevented the forks from lowering when the actuating handle was pulled." (*Id.*) The Pallet Truck had been discarded, however. Therefore, Mr. Cocchiola relied on four first-hand accounts of how the Pallet Truck functioned, as well as how long the Pallet Truck had been in service at McKesson Medical. (*Id.* at 6-7.) In this respect, the Court finds Mr. Cocchiola's "method consist[ed] of a testable hypothesis." *Elcock*, 233 F.3d at 747 (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 742 n.8). To the extent Crown disputes Mr. Cocchiola's conclusions, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Karlo*, 849 F.3d at 83 (quoting *Daubert*, 509 U.S. at 596).

### c. The Fit of Mr. Cocchiola's Testimony

"[T]he expert testimony must fit, meaning the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Calhoun*, 350 F.3d at 321; *McGarrigle v. Mercury Marine*, 838 F. Supp. 2d 282, 289 (D.N.J. 2011). In other words, "the scientific knowledge must be connected to the question at issue." *Paoli*, 35 F.3d at 745 n.13; *McGarrigle*, 838 F. Supp. 2d at 293. "A court 'must examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used.'" *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000) (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999)); *McGarrigle*, 838 F. Supp. 2d at 293.

Crown argues, "Mr. Cocchiola's opinion lacks fit because it is neither relevant nor helpful to the trier of fact." (ECF No. 65-6 at 18.) Crown contends Mr. Cocchiola's "conclusions are based

12

entirely on [McManus]'s testimony, meaning they are supported by no independent facts, measurements, data, or standards." (*Id.*)

McManus disputes Crown's claims and cites Mr. Cocchiola's reliance on the testimony of several fact witnesses who testified to the problems with the Pallet Truck's forks. (ECF No. 73 at 22 (citing Cocchiola Dep. at 86:15-87:2; 90:12-17).) McManus argues Mr. Cocchiola's testimony would assist the trier of fact in resolving a factual dispute, namely the Pallet Truck's manufacturing defect. (*Id.*)

The Court finds Mr. Cocchiola's testimony satisfies the "fit" criterion. As noted, Mr. Cocchiola inspected an exemplar to determine how the PTH 50 was designed to operate. He reviewed the testimony of several McKesson Medical employees who used and/or inspected the Pallet Truck. Mr. Cocchiola's "conclusions . . . could reliably flow from the facts known to [him] and the methodology used." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145.

Therefore, the Court finds Mr. Cocchiola's testimony satisfies the all three criteria: qualifications, reliability, and fit, and is admissible. *See Karlo*, 849 F.3d at 80 (citing *Elcock*, 233 F.3d at 741).

### 2. McManus's *Prima Facie* Products Liability Claim

Crown argues McManus cannot assert a *prima facie* products liability claim because the Pallet Truck is a complex instrumentality, which requires expert testimony to meet the burden of proof. (ECF No. 65-6 at 19 (citing *Toms v. J.C. Penney Co., Inc.*, 304 F. App'x 121, 125 (3d Cir. 2008); *Lauder v. Teaneck Volunteer Ambulance Corps*, 845 A.2d 1271, 1277 (N.J. Super. Ct. App. Div. 2004)).) Crown contends Mr. Cocchiola's opinions are inadmissible and it is it therefore impossible for McManus to assert a *prima facie* claim. (*Id.* at 20.)

Because the Court has found Mr. Cocchiola's opinions are admissible, it need not consider Crown's argument regarding McManus's assertion of a *prima facie* products liability claim.

### 3. McManus's Proof in Support of the Alleged Manufacturing Defect

The New Jersey Products Liability Act, N.J.S.A. §§ 2A: 58C-1, *et seq.* ("PLA") provides plaintiffs with the sole cause of action to prosecute a product liability claim. *Tirrell v. Navistar Int'l, Inc.*, 591 A.2d 643, 647 (N.J. Super. Ct. App. Div. 1991). The PLA specifically defines a "product liability action" to mean "any claim or action brought by a claimant for harm caused by a product, irrespective of the theory of the underlying claim, except for harm caused by breach of an express warranty." N.J.S.A. § 2A:58C-1. "In a products liability case in which the plaintiff alleges a manufacturing defect under the [PLA], the plaintiff has the burden to prove 'the product causing the harm was not reasonably fit, suitable or safe for its intended purpose.'" *Myrlak v. Port Auth. of New York & New Jersey*, 723 A.2d 45, 51 (N.J. 1999) (quoting N.J.S.A. 2A:58C-2). A plaintiff may prove a manufacturing defect by direct evidence or circumstantial proof. *Id.* at 52 (citation omitted). A plaintiff does not need to prove a specific manufacturer's defect, only "that 'something was wrong' with the product.'" *Id.* (quoting *Scanlon v. General Motors Corp.*, 326 A.2d 673 (N.J. 1974)). However "[t]he mere occurrence of an accident and the mere fact that someone was injured are not sufficient to demonstrate the existence of a defect." *Id.* (citing *Scanlon*, 326 A.2d at 673; *Zaza v. Marquess and Nell, Inc.*, 675 A.2d 620 (N.J. 1996)).

If a plaintiff cannot prove a specific manufacturer's defect, he or she may rely on the indeterminate product test. *Id.* at 56. Under the indeterminate product test, a plaintiff must "establish [1] that the incident that harmed him is of the kind that ordinarily occurs as a result of a product defect, and [2] that the incident was not solely the result of causes other than product defect existing at the time the [product] left [the manufacturer]'s control." *Id.* at 57 (citing *Restatement (Third) of Torts* § 3(a) and (b)).

Crown argues McManus has failed to satisfy the second prong of the indeterminate products test, i.e. the Pallet Truck did not malfunction solely due to causes other than a

manufacturing defect.³ (ECF No. 65-6 at 22-23.) McManus disputes the application of indeterminate product test and argues he has proffered sufficient circumstantial evidence to create a question for the trier of fact as to whether a manufacturing defect existed. (ECF No. 73 at 25.)

The Court finds the indeterminate product test applies. While McManus is correct that a plaintiff can rely on circumstantial evidence to prove a product defect (*see id.*), circumstantial evidence alone is appropriate only when a plaintiff alleges a specific defect, *Myrlak*, 723 A.2d at 52. "If a plaintiff cannot prove a specific defect, then it is permitted to rely on the indeterminate product defect test." *Franklin Mut. Ins. Co. v. Broan-Nutone, LLC*, No. 10-cv-4845, 2014 WL 2920622, at *5 (D.N.J. June 27, 2014). "The indeterminate product defect test is mainly applied under circumstances in which the product at issue has been destroyed or [is] not available for testing." *Id.* (citations omitted).

McManus concedes he has not alleged a specific manufacturing defect. (ECF No. 73 at 24-25, 27.) He also argues he does not need to negate other causes of the Pallet Truck's failure.⁴ (*Id.* at 28.) The Court finds McManus has failed to negate other causes of the Pallet Truck's failure as being the sole cause of the alleged malfunction.

Mr. Cocchiola's testimony reveals other factors could have been the sole cause of the Accident. He testified McManus's failure to read the PTH 50's operator manual, as well as

---

³ Crown also argues McManus cannot satisfy the first prong of the indeterminate product test, because Mr. Cocchiola's opinion must be excluded. (Crown's Reply Br. in Supp. of its Mot. for Summ. J. (ECF No. 75) at 4.) Because the Court has found Mr. Cocchiola's opinion is admissible, it need not consider this argument.

⁴ In support of this argument, McManus relies on two cases that predate the New Jersey Supreme Court's adoption of the indeterminate product test in *Myrlak*—*Moraca v. Ford Motor Co.*, 332 A.2d 599 (N.J. 1975) and *Sabloff v. Yamaha Motor Co.*, 283 A.2d 321 (N.J. 1971). (ECF No. 73 at 38.) McManus also relies on *Ebenheoch v. Koppers Indus., Inc.*, 239 F. Supp. 2d 455, 472 n.16 (D.N.J. 2002), but that case involved an alleged specific manufacturing defect and is therefore inapposite.

15

potentially inadequate training by McKesson Medical could have contributed to the Accident. (Cocchiola Dep at 107:7-108:10.) Mr. Cocchiola also cited McKesson Medical's decision to keep the Pallet Truck in service despite complaints about its function also could have caused the Accident. (*Id.* at 109:12-110:13.) Mr. Cocchiola also testified a pallet truck accident can occur on a slope—like the one at Barnegat—even when there is no product defect. (Cocchiola Dep. at 106:25-107:6.) Indeed, McManus's own engineering expert, Wayne F. Nolte, Ph.D., P.E. ("Dr. Nolte"), initially concluded Barnegat's "failure . . . to provide a level surface for the McKesson Medical delivery caused [the] [A]ccident." (Report of Wayne F. Nolte (ECF No. 69-5) at 13.) In view of McManus's failure to negate other factors as the sole cause of the Accident, the Court finds summary judgment is appropriate and Crown is entitled to judgment as a matter of law. *See Snell v. Bostrom Products Co.*, 2005 WL 2654304, at *5 (N.J. Super. App. Div. Oct. 19, 2005) (affirming dismissal of manufacturing defect claim when plaintiff could "not demonstrate that the incident was not solely the result of other likely causes").

Therefore, Crown's Motion for Summary Judgment is **GRANTED**.

### B. Barnegat's Motion for Summary Judgment

"It is well recognized that the common law imposes a duty of care on business owners to maintain a safe premises for their business invitees because the law recognizes that an owner is in the best position to prevent harm." *Romeo v. Harrah's Atlantic City Propco, LLC*, 168 F. Supp. 3d 726, 729 (D.N.J. 2016) (quoting *Stelluit v. Casapenn Enter., LLC*, 1 A.3d 678, 691 (N.J. 2010)). This rule applies to independent contractors and their employees. *Moore v. Schering Plough, Co.*, 746 A.2d 1, 4 (N.J. Super. Ct. App. Div. 2000) (citing *Rigatti v. Reddy*, 723 A.2d 1283 (N.J. Super. Ct. App. Div. 1999)). The landowner has "no duty to protect an employee of an independent contractor from the very hazard created by doing the contract work." *Id.* (quoting *Rigatti*, 723 A.2d

16

at 1283). "This exception to the landowner's general duty exists because '[t]he landowner may assume that the worker, or his superiors, are possessed of sufficient skill to recognize the degree of danger involved and to adjust their methods of work accordingly." *Olivo v. Owens-Illinois, Inc.*, 895 A.2d 1143, 1150-51 (N.J. 2006) (citing *Muhammad v. N.J. Transit*, 821 A.2d 1148, 1156 (N.J. 2003) (quoting *Wolczak v. Nat'l Elec. Prods. Corp.*, 168 A.2d 412, 417 (N.J. Super. Ct. App. Div. 1961))). The exception does not apply when the landowner "retain[s] control over the means and methods of the execution of the project." *Id.* at 1151 (quoting *Muhammad*, 821 A.2d at 1156).

Barnegat argues it is entitled to summary judgment because (1) the slope of the driveway was open and obvious, and (2) Barnegat was not required to protect McManus from hazards inherent in making deliveries with a pallet truck. (ECF No. 66 at 6.) Barnegat also denies it retained control over the means through which McManus made the delivery because he had the ability to control the weight and size of the pallets he delivered. (*Id.* at 9.)

As a threshold matter, the Court must determine whether Barnegat "retain[ed] control over the means and methods" of McManus's work and is therefore not entitled to the exception to the landowner's duty of care. *Olivo*, 895 A.2d at 1151 (quoting *Muhammad*, 821 A.2d at 1156). The Court finds Barnegat did retain such control.

Under New Jersey law, courts must consider "the degree to which the landowner participated in, actively interfered with, or exercised control over the manner and method of the work being performed at the time of the injury." *Sanna v. Nat'l Sponge Co.*, 506 A.2d 1258, 1262 (N.J. Super. Ct. App. Div. 1986) (citing *Gibilterra v. Rosemawr Homes*, 115 A.2d 553, 555 (N.J. 1955); *Wolczak*, 168 A.2d at 417). "[S]pecific instances of direct interference which proximately cause injury . . . such as . . . the giving of a single authorized direction thwarting the [independent

contractor]'s effort to provide safeguards" will abrogate the landowner's[5] immunity. *Wolczak*, 168 A.2d at 415. If the landowner "gives directions for the work . . . or retains control over any part of it, he is required to exercise reasonable care for the protection of others; and he must likewise interfere to put a stop to any unnecessarily dangerous practices of which he becomes informed." *Mavrikidis v. Petullo*, 707 A.2d 977, 985 (N.J. 1998) (citation omitted).

Here, Barnegat exercised control over deliveries to its building. McKesson Medical drivers had complained about making deliveries to Barnegat, because the slope caused pallets to roll out of control on two occasions. (ECF No. 66 ¶ 13; ECF No. 70 ¶ 13.) Nevertheless, Barnegat did not provide a different delivery location. (ECF No. 66 ¶ 13; ECF No. 70 ¶ 13.) Barnegat was informed of a potentially dangerous practice but declined to change that practice. *Mavrikidis*, 707 A.2d at 985. Barnegat's argument that it did not exercise control because McManus could have controlled the size and weight of the pallets he delivered is unavailing. (*See* ECF No. 66 at 9.) The extent to which McManus's negligence could have contributed to his injuries is a question for the trier of fact. *Brodsky v. Grinnell Haulers, Inc.*, 853 A.2d 940, 944 (N.J. 2004).

McManus has proffered testimony from which a jury could conclude Barnegat "retain[ed] control over the means and methods" of McManus's work and is therefore not entitled to the exception to the landowner's duty of care. *Olivo*, 895 A.2d at 1151 (quoting *Muhammad*, 821 A.2d at 1156). Further, McManus's engineering expert, Dr. Nolte, has offered testimony that the slope at Barnegat's facility represented a hazardous condition. (ECF No. 69-5 at 12.) The Court, accepting McManus's evidence as true and drawing all justifiable inferences in his favor, finds a reasonable jury could find Barnegat was liable for his injuries. *See Marino*, 358 F.3d at 247

---

[5] While *Wolczak* concerned a general contractor's liability for a subcontractor's injury, New Jersey courts apply the same standard to landowners and general contractors in instances where either controls the manner or means of a contractor's work. *Muhammad*, 821 A.2d at 1156.

(quoting *Anderson*, 477 U.S. at 255).

Therefore, Barnegat's Motion for Summary Judgment (ECF No. 66) is **DENIED**.

### IV.     CONCLUSION

For the foregoing reasons, Crown's Motion for Summary Judgment (ECF No. 65) is **GRANTED**, and Barnegat's Motion for Summary Judgment (ECF No. 66) is **DENIED**. An appropriate Order will follow.


**Date: May 29, 2018**                                         */s/ Brian R. Martinotti*  
                                                               **HON. BRIAN R. MARTINOTTI**  
                                                               **UNITED STATES DISTRICT JUDGE**