**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **KEVIN MCMANUS,** Plaintiff, v. **BARNEGAT REHABILITATION AND NURSING CENTER,** *et al.* Defendants. | Civil Action No. 15-2109 (ZNQ) (LHG) **OPINION** |

**QURAISHI, District Judge**

Before the Court is a Motion for Summary Judgment filed by Moving Defendant Crown Equipment Corporation ("Crown"). (ECF No. 132.) Crown filed a Brief in Support ("Moving Br.," ECF No. 117-1). Plaintiff Kevin McManus ("McManus") filed an Opposition, ("Opp'n Br.," ECF No. 121), and Crown filed a Reply. ("Reply Br.," ECF No. 124.)

The Court has carefully considered the parties' submissions, as well as their remarks during the oral argument conducted on April 7, 2021. (ECF No. 125.) For the reasons set forth below, Crown's Motion for Summary Judgment will be DENIED.

**I.   BACKGROUND AND PROCEDURAL HISTORY**

The sole issue before the Court is whether McManus has raised a genuine dispute of material fact under the circumstantial evidence test concerning the alleged manufacturing defect in one of Crown's products. *See McManus v. Barnegat Operating Company, L.P.*, 828 Fed. Appx.

846, 849 (3rd Cir. 2020.) Accordingly, the Court will recite the relevant factual background and procedural history.[1]

### A. Factual Background

The Crown PTH 50 Series pallet jack ("pallet jack") is a type of truck that is used to transport heavy loads. (Defendant's Statement of Material Facts ("DSMOF"), ECF No. 117-12, ¶ 12; Plaintiff's Response ("PRSMOF"), ECF 121-17, ¶ 12). Crown's Brochure states that the pallet jack is durable and expected to be used year after year. (ECF No. 121-18, Plaintiff's Statement of Material Facts ¶ 122; ECF No. 124-1, Defendant's Response ¶ 122.) Operators can control the pallet jack by moving the handle at varying angles. (DSMOF ¶ 13; PRSMOF ¶ 13.) The handle contains an actuating lever that is used to lift and lower the two forks at the front of the pallet jack. (*Id.* ¶ 14–16; *Id.* ¶ 14–16.) If the operator pulls the actuating lever towards the handle, the forks will lower faster. (*Id.* ¶ 17; *Id.* ¶ 17.) The angle of the pallet jack's handle will not affect the speed at which the forks are lowered. (*Id.* ¶ 19; *Id.* ¶ 19.)

On August 3, 2012, McManus completed a pre-shift inspection of a pallet jack, and successfully completed four deliveries prior to the accident. (*Id.* ¶¶ 22,25; *Id.* ¶¶ 22,25.) After the four deliveries, McManus used the same pallet jack to make a delivery to Barnegat Rehabilitation and Nursing Center. (*Id.* ¶ 21; *Id.* ¶ 21.)

At the Barnegat Rehabilitation and Nursing Center, McManus had to carry out the delivery on an incline. (*Id.* ¶ 26; *Id.* ¶ 26.) Therefore, because McManus was on a downward incline, McManus backed the pallet away in an "S" shape maneuver to avoid the full weight of the pallet gaining momentum while unloading the pallets. (*Id.* ¶ 28; *Id.* ¶ 28.) One of the pallets picked up

---

[1] For a full recitation of the factual background and procedural history, the Court refers the parties to its May 29, 2018 Opinion. *See McManus v. Barnegat Rehabilitation and Nursing Center*, Civ. No. 15-2109, 2018 WL 2411614 (D.N.J. May 29, 2018.) (ECF No. 82.)

significant momentum as McManus moved it down the incline. (*Id.* ¶ 29; *Id.* ¶ 29.) To slow it down, McManus squeezed the pallet jack's lever, but the pallet jack's forks did not immediately lower. (*Id.* ¶ 30–31; *Id.* ¶ 30–31.) McManus lost control of the pallet jack, and his left arm was injured as the pallet jack dragged him down the slope. (*Id.* ¶ 30–31; *Id.* ¶ 30–31.)

### B. Procedural History

On July 14, 2017, Crown filed its first Motion for Summary Judgment. (ECF No. 65.) On May 29, 2018, the court granted Crown's Motion for Summary Judgment. *McManus v. Barnegat Rehabilitation and Nursing Center*, Civ. No. 15-2109, 2018 WL 2411614 (D.N.J. May 29, 2018.) (ECF No. 82.) Crown argued that McManus offered no proof of a manufacturing defect. (*See* ECF No. 65-6 at 1–2.) The Court found that the circumstantial evidence test is appropriate only when a plaintiff alleges a specific defect. (ECF No. 82 at 15.) Accordingly, because McManus conceded that he did not allege a specific manufacturing defect, the Court found that the indeterminate product test applied. (*Id.*)

On appeal, the Third Circuit reversed and remanded the district court's judgment, reasoning that "[w]hile the *Myrlak* court noted that the indeterminate product defect test is limited to cases where a plaintiff cannot prove a specific defect, that does not necessarily mean a plaintiff who cannot prove a specific defect is limited to the indeterminate product defect test." 828 F. App'x at 849. Therefore, the Third Circuit concluded that "the New Jersey Supreme Court's Opinion in *Myrlak* does not preclude the use of the circumstantial evidence test when a plaintiff cannot identify a specific defect." *Id.* The Circuit Court reversed and remanded with instructions that the district court consider whether there is a genuine dispute of material fact under the circumstantial evidence test. *Id.*

On April 7, 2021, the Court held an oral argument. (ECF No. 125.) The Court reserved its decision and directed the parties to file a letter advising whether the matter would be submitted

to private Alternative Dispute Resolution ("ADR"). (ECF No. 126.) On May 28, 2021, the parties informed the Court that they could not agree to binding arbitration or other forms of ADR. (ECF No. 129.) Thereafter, Crown renewed its Motion for Summary Judgment and expressed its reliance on the previously submitted Brief in Support. (ECF Nos. 117, 132.)

## II. LEGAL STANDARD

A moving party is entitled to summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id*. There can be "no genuine issue as to any material fact," however, if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id*. at 323; *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255). A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the

truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

### III.  JURISDICTION

Pursuant to 28 U.S.C. § 1332, the matter is before the Court on diversity jurisdiction.

### IV.  DISCUSSION

To assert a manufacturing defect under the New Jersey Products Liability Act, N.J.S.A. 2A:58C-1, a plaintiff must establish "that [a] product was defective, that the defect existed when the product left the manufacturer's control, and that the defect proximately caused injuries to the plaintiff, a reasonably foreseeable or intended user." *Myrlak v. Port Auth. of N.Y. & N.J.*, 157 N.J. 84, 97 (1999). To establish a manufacturing defect "requires only proof, in a general sense and as understood by a layman, that 'something was wrong' with the product." *Scanlon v. Gen. Motors Corp.*, 65 N.J. 582, 591 (1974). If the product used by the plaintiff fails to conform to standards of other units of the same kind, it is a manufacturing defect. *Mendez v. Shah*, 28 F. Supp. 3d 282, 298 (D.N.J. 2014). Significantly, New Jersey products liability law does not require the injured plaintiff "to prove a specific manufacture's defect." *Id.* at 297.

A plaintiff may rely on circumstantial evidence to show that an accident would not normally have occurred absent a product defect. *Scanlon*, 65 N.J. at 591. Under the *Scanlon* circumstantial evidence standard, a court will look to, "[t]he age and prior usage of the product in relation to its expected life span, durability and effective operability without maintenance . . ." as factors relevant to the circumstantial evidence inquiry. *Id.* at 593, 595. Additional circumstantial evidence such as, "proof of proper use, handling or operation of the product and the nature of the malfunction, may be enough to satisfy the requirement that something was wrong with [the product]." *Huddell v. Levin*, 537 F.2d 726, 734 (3rd Cir. 1976) (surveying state court cases). In

relying on circumstantial evidence, the mere fact that a product is relatively new does not without more establish a defective condition, but "the older a product is, the more difficult it is to prove that a defect existed while in the manufacturer's control." *Scanlon*, 65 N.J. at 592–93.  In the alternative, "a defective condition can also be proven by the testimony of an expert who has examined the product or who offers an opinion on the product's design." *Huddell*, 537 F.2d at 734.

Accordingly, under the circumstantial evidence test, the Court looks to factors such as proof of proper use, handling or operation of the product, the nature of the malfunction, the age and prior usage of the product, and durability to determine whether there is a genuine dispute of material fact as to the pallet jack's alleged defect.  *Scanlon*, 65 N.J. at 592–93; *see also Kuhar v. Petzl Co.*, App. No. 19-3900, 2022 WL 1101580, at *3 (3d Cir. Apr. 13, 2022).

### A. "Age and Prior Usage" of the Pallet Truck "in Relation to Its Expected Life Span, Durability and Effective Operability without Maintenance

McManus contends that the pallet jack was brand-new, and that it did not operate properly. (Opp'n Br. at 30.)  Crown argues that McManus has failed to provide sufficient evidence from which a reasonable jury could establish the age of the pallet truck and its prior usage.  (Reply Br. at 8.)

In support of his claims, McManus testified that shortly after purchase, he received notification that six new jacks came in. (ECF No. 121-2, attached as Ex. A., Plf. Dep., pg. 95:21–25, pg. 97:11–12.) Specifically, McManus testified that the pallet jacks arrived roughly 3 months prior to the accident. (*Id*. at 97:20–21.)  Consistent with McManus's testimony, Eric Lambert ("Lambert"), McManus's Supervisor, also testified that the pallet jacks were relatively new and stated that "we did not have that jack for more than, I would say, somewhere in the range of two to four months. (ECF No. 121-3, attached as Ex. B, pg. 83:15–18.)  In the instant Motion, Crown

argues that the age of the jack is nevertheless unknown because McManus has "produced no work orders documents the pallet truck's maintenance history; no records documents who previously used the pallet truck, when and for what tasks, and no evidence regarding the conditions of the pallet truck." (*Id*. at 9.)

As to prior usage, McManus contends that the pallet jack had a history of not operating properly. (Opp'n Br. at 31.) McManus argues that the pallet jack used on the date of the accident is the same one his colleague, Timothy Collins ("Collins") had used and reported for operating issues. (*Id*.) In support, McManus cites Collins' testimony. Collins testified that, shortly after the pallet jack arrived and was assigned to him, he noticed that when he went to lower the pallet jack, instead of dropping immediately down, the forks lowered very slowly, and the pallet continued to roll forward. (ECF No. 121-5, attached as Ex. D, Collins Dep. pg. 53:22–25.) Moreover, Collins testified that when he experienced the same problem a day or two later, he reported it to Lambert. (*Id*. at pg. 54: 7–12.) This was corroborated by Lambert, who testified that the pallet jack was brought to the internal maintenance department. (Ex. B, pg. 59:2–16.) Although the maintenance department reported that the pallet jack was functioning properly, (*id*. at pg. 59:11), Collins testified that it still was not working properly. (Ex D, pg. 57:2–6.) Collins testified that McManus used his truck and pallet jack on the date of the accident. (Ex D, pg. 61: 2–25.) This was also confirmed by Lambert, who testified that on the date of the accident McManus used the pallet jack that Collins had been using. (Ex B, pg. 83:15.)

Crown argues that McManus has not established that a reasonable jury could find that the pallet jack used on the day of the accident was the same pallet jack used by Collins. (Reply Br. at 8.) In fact, Crown argues that there is inconsistent evidence regarding whether Collins experienced any problems with his pallet jack. (*Id*. at 9.) Crown cites testimony from Edward Thurston that

he had no recollection of Collins telling him about any problems he was experiencing with his pallet jack not working.  (ECF No. 121-11, attached as Ex. J pg. 62–63.)

        **B.**      **Proper Use, Handling or Operation of the Product**

It is undisputed that at the time of the accident McManus was (1) using the loaded pallet truck on a slope, (2) was walking the pallet truck backwards down the incline, and (3) was turning the pallet truck in an S-shaped maneuver to pull it towards himself.  (DSMOF¶ 26–28; PRSMOF ¶ 28.)  McManus' use was therefore inconsistent with the pallet truck's Operator Manual that, the parties agree, advise operators to "avoid moving loads up or down grades, ramps or inclines," "work from the high side of the grade," and "not turn."  (DSMOF¶ 20; PRSMOF ¶ 20.)  In fact, McManus's own product liability expert, Thomas J. Cocchiola P.E., C.S.P., ("Cocchiola"), conceded on deposition that McManus was not operating the pallet truck in accordance with the Operating Manual and that this probably contributed to the accident.  (ECF No. 117-8, attached as Ex. 5, Cocchiola Dep., pg. 102:8–20.)

In McManus' favor, it is undisputed that the same Operator's Manual instructs operators that "[s]hould you have to make an emergency stop the truck can be stopped by rapidly lowering the load on the forks."  (ECF No. 117-5, attached as Ex. 2.)  On deposition, McManus testified that he tried to use this feature leading up to his injury to stop the truck.  (Plf. Dep. 129:15–23.)  At least with respect to his attempted use of the feature to execute an emergency stop, McManus' use therefore appears to have been proper insofar as it conformed to the Operator's Manual instruction concerning how to perform an emergency stop.

        **C.**      **The Nature of the Malfunction**

Next, the Court looks to the factors of "the handling or operation of the product and the nature of the malfunction."  *Huddell*, 537 F.2d at 734.  Crown's Rule 30(b)(6) witness, Ronald Grisez ("Grisez"), Director of Product Safety for Crown, testified as to the design of the pallet

8

jack. According to Grisez, its design allows for the forks to be lowered by using the actuating lever regardless of the position of the control handle. (ECF No.121-6, attached as Ex. E, Grisez Dep. pg. 46:15–19.) Specifically, Grisez stated that if the actuating lever is pulled to the upmost position, it should drop immediately, effectively at the speed of gravity. (*Id*. at pg. 47:12–18.) Grisez also testified that how "far you move the actuating lever," can impact the speed of the lowering of the forks and that a user can "slight move it, which would give you more of a feathering effect so you can lower it gently." (*Id*. at pg. 46:20–47:5.)

McManus testified that on the date of the accident he squeezed the pallet truck's release lever, but "nothing happened" and the truck's forks "didn't drop." (Plf. Dep. 129:15–23.) Lambert likewise testified that, shortly after the accident when he tested the pallet jack, he found that "the jack would raise as expected but would not drop when the trigger was released unless the handle was in the full upright position. If it was at any angle when you squeeze the trigger it would not drop." (Ex. B, pg. 115:8–14.) Lambert also confirmed that although the incident report has since been lost, he was able to see it, and he ultimately tagged the pallet jack to not be used. (*Id*. pg 106:24–107:4, 115:1–18.)

In summary, while McManus lacks documents or the pallet jack itself to establish its age and prior usage, he nevertheless presents his own testimony together with corroborating testimony from Collins and Lambert in support of his position that his accident would not normally have occurred absent a product defect. The absence of documents or the pallet jack in question are not fatal to his case at this stage, as Crown appears to contend. Likewise, the testimony Crown cites from Thurston to the effect that he did not recall any reported defects as to the jack is not, on its face, contradictory.[2]

---

[2] Even if Thurston's testimony were construed to contradict the testimony from McManus, Lambert, and Collins, this Court would not credit his testimony over theirs at the summary judgment stage. *See Burton v. Teleflex, Inc.*, 707

The Court is to draw all justifiable inferences in McManus's favor as the nonmovant, and accordingly finds that Plaintiff has presented sufficient circumstantial evidence including Plaintiff's own testimony and corroborating testimony from Collins and Lambert, that a reasonable jury could find that the nature of the malfunction was the result of a manufacturing defect.

### D. Causation

Under the New Jersey Products Liability Act, a plaintiff must establish "that the defect proximately caused injuries to the plaintiff, a reasonably foreseeable or intended user." *Myrlak v. Port Auth. of N.Y. & N.J.*, 157 N.J. 84, 97 (1999). If a product is deemed to be defective, a jury "must then determine whether the [defect] proximately caused the injury." *Brown v. United States Stove Co.*, 98 N.J. 155, 168–69 (1984).

Here, it is undisputed that McManus injured his left arm when he was dragged by the pallet jack. (DSMOF ¶ 30–31; PRSMOF ¶ 30–31.) McManus argues that if the pallet jack's brake and actuating lever had worked as designed, the pallet jacket would have stopped immediately when the forks were lowered. (Opp'n Br. at 40.) Although Crown highlights other factors that could have caused McManus' injuries this does not, as a matter of law, excuse Crown from liability. *Brown,* 98 N.J. at 171 (finding that "even if a defect is a contributing or concurring cause, but not the sole cause, of an accident, the manufacturer will be liable.") Accordingly, summary judgment in favor of Crown is not appropriate at this time. *See Roberts v. U.S.*, 316 F.3d 489, 494 (3d Cir. 1963) (citing *Martin v. Bengue, Inc.*, 25 N.J. 359, 374 (1957) (holding issues of proximate cause are considered to be jury questions.))

---

F.3d 417, 428 (3rd Cir. 2013). "Conflicting testimony of witnesses invokes credibility concerns that are best left to a jury to decide." *See Howmedica Osteonics Corp. v. Zimmer, Inc.*, Civ. No. 11-1857, 2012 WL 5554543, at *8 (D.N.J. Nov. 14, 2012).

## V.  CONCLUSION

For the reasons stated above, the Court will deny Crown's Motion for Summary Judgment.

An appropriate Order will follow.


Date: **May 22, 2023**

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**
